## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**TEMUJIN KENSU**, **individually and on behalf of all others similarly situated***;*

      *Plaintiffs*,                   Case No.

  v.                                 Hon.

**KEEFE COMMISSARY NETWORK, L.L.C.**
**D/B/A ACCESS CORRECTIONS,**

      *Defendant.*
_____/
Keith Altman (P81702)
Solomon Radner (P73653)
Ari Kresch (P29593)
*Attorneys for Plaintiff and the Class*
26700 Lahser Road, Suite 401
Southfield, MI 48033
Office: (866) 939-2656
Direct: (516) 456-5885
kaltman@excololaw.com
_____/

## CLASS ACTION COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF AND DAMAGES

    **NOW COMES** Plaintiffs, by and through their attorneys, EXCOLO LAW, PLLC, and complain and allege on personal knowledge as to Plaintiffs' own acts and on information and belief as to all other allegations against THE KEEFE COMMISSARY NETWORK, L.L.C., ("KEEFE") as follows:

## INTRODUCTION

1. This class action arises from the deceptive practices, methods, solicitations, advertisements, promises, extortions, and representations contrived by Defendant, whereby Defendant engaged between 25,000 and 50,000 Michigan prisoners, Plaintiffs and Class herein, to participate in the SecureMedia MP3 Program, ("MP3 Program"), a digital music service program initiated to provide prisoners with the ability to purchase MP3 music players and MP3 music files through Defendant.

2. The class is defined as:

> Individuals who are or were prisoners incarcerated in facilities of the Michigan Department of Corrections and beginning in 2012, purchased products, content, and services from Defendant's MP3 Program, represented by Defendant to be of a different kind, quality, and fundamental model than the program actually was.

3. Defendant conspired to induce Plaintiffs and the Class to make millions of dollars' worth of purchases through the MP3 Program, while simultaneously engaging in misconduct for the purpose of defrauding, deceiving, and extorting funds from Plaintiffs and the Class.

4. Through collusion and conspiracy, Defendant deceptively misrepresented fundamental aspects of the fraudulent MP3 Program while inducing Plaintiffs' purchases, failing to disclose the deceitful and extortive nature of the program as a whole, the defective and deficient quality of the products contained, and how

ultimately, without any due process, Plaintiffs and the Class would be deprived of their millions of dollars' worth of digital property at the termination of the MP3 Program.

5. Defendant's collusive tactics led to Defendant holding an abusive monopolistic power over prisoner's access to music, restricting Plaintiffs and the Class from access to content and services that only Defendant owned an interest in.

6. After years of urging Plaintiff and Class to drain their bank accounts, inducing millions of dollars' worth of numerous unnecessary purchases, updates, and repairs, Defendant engaged in theft when they unexpectedly terminated the MP3 Program, denying Plaintiff and the Class access to their millions of dollars' worth of purchased content, refusing to provide Plaintiffs and the Class with any recourse to remedy the situation.

7. Plaintiffs and the Class state that due to Defendant's widespread and intentionally deceptive practices, methods, solicitations, advertisements, promises, and representations, Plaintiffs and the Class were wrongfully and unfairly induced by Defendant into purchasing products and services through the MP3 Program.

8. Plaintiffs and the Class state that they justifiably and reasonably relied on the deceptive and fraudulent practices, promises, and misrepresentations of Defendant in their advertisements, solicitations, and representations made as they were inducing Plaintiffs' purchases.

9. Accordingly, Plaintiffs and the Class have been extensively damaged, as stated in this Complaint.

## <u>DESCRIPTION OF THE PLAINTIFF CLASS</u>

10.    This class action is brought by Plaintiff Temujin Kensu, individually and on behalf of a Class of similarly situated individuals who are residents and/or citizens of Michigan and since 2012, have purchased MP3 players, content, products, and accessories from Defendant through their SecureMedia MP3 Program.

11. Through its marketing, promises, advertisements, or representations, Defendant conspired to deprive individuals of, or will deprive individuals of, millions of dollars' worth of lawfully and permanently owned MP3 music content, products, and accessories, which were purchased through Defendant's MP3 Program, through one or more of the following methods:

   a. Advertised, solicited, and represented the character, nature, and functionality of the MP3 Program as a whole, the quality of the products contained, and the extent to which ownership or access to products purchased would exist, with no intent to disclose the deceitful and extortive nature of the program as a whole, the defective and deficient quality of the products contained, and how ultimately, without any due process, Plaintiffs and the Class would be deprived of their millions of

dollars' worth of digital property at the termination of the MP3 Program; and

b. Made false or misleading representations of facts or statements of fact material to Plaintiffs' purchase of MP3 products, content, services, and accessories from Defendant's MP3 Program, including, but not limited to, the promises that the products, content, and accessories they were purchasing:

    i.   were the Purchasers' personal property and theirs to own, forever;

    ii.   would "always be available" at "anytime" the purchaser desired it, extending throughout their entire incarceration as well as upon their release;

    iii.   were of a certain merchantable quality and character;

    iv.   contained certain functionality and services which did not exist or did not function as described.  All of the above were such that the customer reasonably believed the represented product to be other than it actually is; and

c. Failed to disclose or concealed the deceitful and extortive nature of the program as a whole, the defective and deficient quality of the products contained, and how ultimately, without any due process, Plaintiffs and

the Class would be deprived of their millions of dollars' worth of digital property at the termination of the MP3 Program, deceiving customers and inducing them to believe the products they were purchasing were significantly different and worth substantially less than as represented; and

d. Sold customers the undisclosed or less desirable products, content, services, and accessories, rather than the products, content, services, and accessories as represented and promised.

## PARTIES

### A.   PLAINTIFFS

12. Plaintiff Temujin Kensu purchased thousands of dollars' worth of songs, content, services, and accessories from Defendant Keefe Commissary Network, L.L.C. through their SecureMedia MP3 Program from 2008 through 2017.  At all times relevant to this action, Plaintiff has been and is currently incarcerated in facilities of the Michigan Department of Corrections.  Plaintiff is a citizen of Michigan.

13. As used herein, Plaintiff and the Class will be collectively referred to as "Plaintiffs."

14. As used herein, "purchasing Plaintiff" shall mean and refer to the Plaintiffs identified herein as someone who purchased SecureMedia MP3 Program products, content, services, and accessories from Keefe.

## B.     DEFENDANT

15. Defendant Keefe Commissary Network, L.L.C., ("Keefe"), is a Missouri corporation with its principal place of business located in St. Louis, Missouri.  It operates in Michigan under the assumed name Access Corrections.  Keefe is authorized to conduct business in Michigan and may be served by its registered agent The Corporation Company at 40600 Ann Arbor Rd., E STE 201, Plymouth, MI 48170. Keefe is a wholly owned subsidiary of The Keefe Group.

16. Keefe derives substantial income from doing business in Michigan.

17. Upon information and belief, Keefe did advertise, market, and sell SecureMedia MP3 Program products, content, services, and accessories to consumers in the State of Michigan.

18. This court has personal jurisdiction over Keefe named herein because said Keefe has sufficient minimum contacts with the forum state upon which to predicate personal jurisdiction.

## <u>JURISDICTION AND VENUE</u>

19. Keefe is a Missouri LLC and has its principal place of business in Missouri.

20. At all times relevant to this action, Keefe was engaged in substantial business activities in Michigan, including, but not limited to, advertising, marketing, contracting, and selling SecureMedia MP3 Program products, content, services, and accessories to thousands of prisoners in Michigan.

21. At all times relevant to this action, Keefe engaged, either directly or indirectly, in the business of marketing, promoting, distributing, and selling SecureMedia MP3 Program products, content, services, and accessories within Michigan with a reasonable expectation that the products, content, services, and accessories would be used and relied upon in this state, and thus regularly solicited or transacted business in this state.

22. Plaintiff and all members of the Class are domiciliaries of the State of Michigan, are expected to number in the thousands, the amount in controversy is more than $5,000,000 exclusive of interests and costs, and Plaintiff is a citizen of a different state than Defendant.

23. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and because Plaintiffs are a resident of this judicial district, Defendant does business within this judicial district, and a substantial part of the events and omissions giving rise to the claims alleged occurred herein.

## COMPLIANCE WITH PRE-EXHAUSTION REQUIREMENTS

24. Plaintiffs adopt by reference each and every paragraph of this Complaint as if fully copied and set forth at length herein.

25. Plaintiffs have complied in all respects with the Pre-Exhaustion Requirements of the Prison Litigation Reform Act through the appropriate grievance process of the MDOC.

26. Plaintiffs have exhausted all administrative remedies.

## COMMON FACTUAL ALLEGATIONS

### A.   DEFENDANT'S ADVERTISED MP3 PROGRAM

27. The Keefe Group is a nationwide company that "focuses exclusively on corrections."[1] Comprised of six operating companies, The Keefe Group "develops innovative products and services" addressing various aspects of correctional commissary operations.[2]

28. Keefe Group owns Defendant Keefe Commissary Network, LLC., "the nation's leading provider of automated commissary management services and technologies to city, county, and state correctional facilities nationwide."[3]

29. Defendant Keefe serves more than half a million inmates weekly, servicing 12 out of 15 outsourced state departments of corrections.[4]

30. Since no later than 2008, Keefe has contracted with Defendant MDOC to provide various commissary services to inmates housed in all MDOC correctional facilities throughout Michigan.

31. One such service that Keefe provides to correctional facilities nationwide is the Access SecureMedia Player and Music Download Program ("MP3 Program").[5]

---

[1] https://www.keefegroup.com/companies-101
[2] *Id.*
[3] https://www.keefegroup.com/companies/keefe-commissary-network-112
[4] *Id.*
[5] https://www.keefegroup.com/services/media-program-158

32. Keefe's MP3 Program provided "inmate entertainment technology designed to provide greater safety and security in correctional agencies."[6]

33. Keefe's MP3 Program was operational in MDOC facilities from the fall of 2008 until February 2017.

34. Defendant's MP3 Program allowed inmates to purchase an Access Secure Media Player ("Player"), a device that allows inmates to purchase MP3 music files and other content on a hand-held device.

35. Defendant advertised the versatility of their MP3 players, telling inmates that the "player's compact size makes your music 100% mobile - take it everywhere!"[7] Additionally, Defendant urged inmates to "Check our music library of over 10,000 of your favorite artists and song titles, with more than 2.5 million titles available!"[8]

36. The Player was advertised as "pre-loaded with a catalog of millions of song titles" available for purchase, allowing inmates to "spend endless hours searching for music without tethering to a kiosk."[9]

---

[6] *Id.*
[7] https://www.accesscatalog.com/shop/index.html?ProgramID=550
[8] *Id.*
[9] https://www.keefegroup.com/services/media-program-158



*Figure 1: Access Secure Media Player[10]*

37. In addition to MP3 media players and downloadable digital MP3 music content, Defendant advertised and sold "other interactive content to inmates,"[11] such as "education, games, mail, and photos."[12]

38. This "other interactive content" advertised, promised, and represented to Plaintiffs and the Class available through the media players purchased in the MP3 Program included Defendant's Access Secure Photo program and Defendant's Access Secure Mail Program.

39. Access Secure Photo program promised to give "an inmates family and friends the ability to send photos electronically,"[13] allowing the inmate to feel "connect to their loved ones' daily lives" through photographs would could be "printed,

---

[10] *Id.*
[11] https://www.keefegroup.com/companies/access-corrections-114
[12] https://www.keefegroup.com/services/media-program-158
[13] https://www.keefegroup.com/companies/access-corrections-114

sent for download" to the inmate's "Access to Entertainment media player," or sent to an inmate kiosk available to inmates inside a prison's common area.[14]



*Figure 2: Defendant's Advertisement of Secure Photo Program[15]*

40. Inmates who purchased into Defendant's MP3 Program were also promised the ability, through Defendant's Secure Mail program, to communicate with family and friends directly on MP3 Players purchased from Defendant, allowing inmates to "quickly and easily send electronic messages to their loved one."[16]

41. Inmates purchased MP3 songs, content, and other services from Defendant through interactive kiosks inside the correctional facilities called Music Wardens.

---

[14] https://www.keefegroup.com/services/photo-mail-128
[15] https://www.keefegroup.com/services/photo-mail-128
[16] https://www.keefegroup.com/services/email-120



*Figure 2: Music Warden kiosk*[17]

42. The Music Warden kiosk allowed inmates to make purchases of MP3 music content, products, and services. Defendant controlled each purchase and how much each purchase cost.

43. The Music Warden kiosk also provided inmates with access to the digital content the inmate purchased. While the individual MP3 Players each had a specific storage capacity, inmates could load, delete, or store content that they had previously purchased through the Music Warden kiosk on Defendant's digital network. For example, if an inmate had an MP3 Player full to capacity with digital content, that inmate could 'store' additional content he purchased through Defendant's MP3 Program, like thousands of dollars' worth of MP3 music, on

---

[17] https://www.keefegroup.com/services/media-program-158

Defendant's network through the Music Warden kiosk.  If the inmate wished to 'swap out' the music on his MP3 Player with the content he owned that that was stored on Defendant's network, he would have to use a Music Warden kiosk to access the music and load it on his MP3 Player.

44. In selling and advertising the MP3 Program, Access Corrections boasts that corrections staff would "no longer need to manually sell, account for, replace or otherwise deal with cassettes and CDs," as all inmate purchases could be made through this program.[18]

## B. THE FRAUDULENT, DECEPTIVE, AND MONEY-GRABBING SCHEME THAT IS DEFENDANT'S MP3 PROGRAM

45. At the outset of the MP3 Program, Defendant engaged in a deceptive conspiracy to force Plaintiffs to purchase into the MP3 Program, blocking Plaintiffs and the Class from purchasing alternative forms of devices and music products.

46. Prior to the MP3 Program's initiation, Plaintiffs enjoyed access to a wide range of quality music in multiple forms, including cassette tapes and CDs, as well as quality CD and tape players from well-known brands like Panasonic, Hitachi, and Sony.

---

[18] https://www.keefegroup.com/services/media-program-158

47. Once the MP3 Program had begun, Defendant engaged in conspiracy and abuse, colluding to limit Plaintiffs from access to any alternative forms of music, forcing Plaintiffs to purchase their music from the MP3 Program instead.

48. Throughout the duration of the MP3 Program, Defendant through the Michigan Department of Corrections ("MDOC"), restricted Plaintiffs from purchasing Compact Disc ("CD") players, CD music and content, and alternative forms of MP3 Players and content that were not owned by Defendant. Additionally, Defendant caused the MDOC to cancel Plaintiffs access to cassette tape vendors.

49. Plaintiffs sought options to maintain the music they owned prior to the implementation of the MP3 Program. The Prisoner Benefit Funds agreed to pay for and operate a program that would permit prisoners to "burn" their many cassette tapes, which they compiled and collected over years, into MP3 files, so that they could be used in conjunction with Defendant MP3 Program. In an act designed to drive Plaintiffs and the Class to make purchases through the MP3 Program, Defendant refused.

50. Plaintiffs were essentially forced into the MP3 Program, as after the beginning of the MP3 Program in 2008 if Plaintiffs wished to listen to or purchase music, the only option available to them was to make purchases through Defendant's MP3 Program.

51. After cornering the MDOC music market through their monopolistic practices, policies, and coercion, Defendant engaged in price gouging for their content, products, and services. If Plaintiffs wished to make purchases for music-related items, either through the MDOC commissary or Defendant's MP3 Program, Plaintiffs were expected to pay exorbitant fees for those items.

52. Defendant charged Plaintiffs exorbitant rates for their headphones, MP3 Players, and MP3 content. Defendant's price gouging methods included charging $10.00 for a low quality, low-grade set of headphones, worth a fraction of the price. Additionally, Defendant's price gouging extended to charging near-destitute inmates $137.50 for low-grade MP3 Players. Absent a majority of features found on common MP3 players at one-third the price, Defendant's MP3 Players were prone to breakage and malfunction, requiring Plaintiffs to frequently pay for repairs or to buy a new MP3 Player altogether.

53. Defendant's practice and policy of exorbitant price-gouging also extended into the actual MP3 content, as Defendant charged Plaintiffs the unheard-of price of $1.48 per song.

54. Early receipts for purchases made through Defendant's MP3 Program labeled the cost of each song to be $1.00, yet Defendant required Plaintiffs to write the cost of "$1.48 ea." or each payment form.

55. In furtherance of Defendant's money-grabbing conspiracy to defraud Plaintiffs out of millions of dollars, Defendant restricted inmates from any and all access to free music sources, requiring Plaintiffs to purchase music that is often available to consumers for free.

56. While charging Plaintiffs exorbitant rates for this MP3 music content, Defendant purchased this music in outdated "package catalogs" in bulk for fractions of the cost they sold to inmates, permitting Defendant to make millions in revenue at the unnecessary and fraudulent expense of Plaintiffs.

57. Additionally, Defendant knowingly transferred and sold Plaintiffs stolen or unauthorized content, including, but not limited to, files exclusively sold on "Sony Zune" and "iTunes" platforms. Often times, these songs were even tagged with security beeps indicating they were illegally copied, downloaded, and sold to Plaintiffs. Many Plaintiffs still have such tagged and marked music on their devices to date.

58. Defendant also banned access to "long songs," often "hits," because they feared Plaintiffs would 'fill' their MP3 Players with content and thus be unable to buy more music from Defendant, increasing their profits.

59. After requiring Plaintiffs to purchase into an MP3 Program, advertising an MP3 Player that included the functionality of a rechargeable battery, Defendant conspired to further drive their money-grabbing scheme by blocking access to

the rechargeable MP3 Player, requiring Plaintiffs to purchase a "new," outdated player which required battery power.

60. As the only battery vendor in the correctional facility, Defendant further drove their profits up by conspiring to force Plaintiffs to buy hundreds of thousands, if not millions, of batteries from Defendant in order to use their "new" MP3 Players.

61. Furthermore, Defendant wrote and installed a software on these "new" MP3 players that required Plaintiffs' MP3 Players to have "batteries at least 50% capacity" to turn on.

62. Defendant next conspired to further drive battery sales by advertising, marketing, and selling another "new" player, which was nothing more than a larger, but identical, version of the prior player, except the "new" player required four batteries instead of two. In order to massively increase battery sales, Defendant then aggravated this violation by changing from selling quality Duracell or Panasonic batteries to generic imports (ION's). After the switch, the cheap, generic imports were the only batteries available to Plaintiffs through the MDOC vendor throughout the MP3 Program contract period.

63. Additionally, Defendant required Plaintiffs to buy a "new adaptor" for an MP3 Player, claiming that the previous adaptor would "ruin them." In an act of willful deception to drive Plaintiffs to the more expensive and functionally the same adaptor (except for a red "om light" that the new adaptor had, which essentially

served no purpose other than to notify the user when the adaptor is plugged in), tens of thousands of Plaintiffs sheepishly bought the new adaptor, fearing they would lose any and all purchased content, as the old adaptor was represented to possibly "destroy" their MP3 Players.

64. Defendant next conspired to remove purchased features, functionality, and unique services from the MP3 Program.

65. One such unexpectedly removed feature was an SEC-100 MP3 Player's Sound Equalizer. The SEC-100 MP3 Player was marketed to MP3 Program consumers as a new, exciting product, containing the functionality of a sound equalizer. Sound equalizers allow consumers to make precise adjustments to the sound frequencies of their MP3 Players.

66. Defendant unexpectedly removed the Sound Equalizer from the SEC-100 MP3 Players' functionality, locking consumers' MP3 Player into a "classical music setting." Not only did this change the functionality of the player to significantly affect the sound quality of the MP3 Players, but additionally, this feature was one of the main selling points of the device.

67. As Defendant extended their all-out money-grab in an attempt to induce Plaintiffs to make more purchases into the MP3 Program, Defendant conspired to remove the "Clock" feature from later-model MP3 Players.  Another selling point for most MP3 Players, the "Clock" feature allowed consumers to read the day, date,

and time. As many Plaintiffs were indigent, and could not afford to own both a clock and an MP3 Player, and relied on this MP3 Player's functionality for knowing the day, date, and time, removal of this feature forced Class members to either upgrade their MP3 Player to a model which included that functionality, or purchase a watch or clock from Defendant, who is the only vendor for watches or clocks in MDOC.

68. While Defendant advertised and marketed the MP3 program to consumers to contain "unlimited amounts" of music, Defendant failed to maintain proper, complete and accessible records of Plaintiffs' music purchases, often resulting in confusion, complaints, and the need for Plaintiffs to repurchase music from Defendant that they had already previously purchased.

69. This advertisement of "unlimited music" was furthered by the advertisement of the new feature of a "Re-Order Manager," advertised and promised the "Re-Order Manager" would allow consumers to "delete and re-order as many songs as they wish." This was accompanied by a "Re-Order Guarantee," a promise to Plaintiffs that Defendant would "always retrieve music upon request." This feature was only implemented in furtherance of the conspiracy to drive inmates to purchase more music.

70. Defendant additionally advertised and marketed the MP3 Program to contain "photo and email" features, inducing thousands of Plaintiffs to buy additional

MP3 Players that Defendant promised would contain photo and email functionality. This promised functionality never came to fruition and Plaintiffs were never able to use this functionality throughout the duration of the MP3 Program.

71. Even after countless complaints, Defendant continued to exaggerate MP3 Program promises, advertising that the "new" Players had a "USB port" for a "mini keyboard" from which the MDOC and Access claimed, Plaintiffs would be able to "write messages and letters as well as 'tickets' (complaints) 'directly to Access,'" which would allegedly then be "immediately delivered upon plugging into the Music Warden kiosks." Like so much else, this was yet another deception by the Defendant which never manifested.

72. Throughout the duration of the fraudulent MP3 Program, Defendant refused to develop or maintain any semblance of a "complaint" or "resolution" process for Plaintiffs to find any remedies for issues experienced. From its outset, the MP3 Program was plagued with malfunctions and complications with the MP3 content, the MP3 players, and the MP3 Program accessories purchased by Plaintiffs. Prisoners were not provided with any customer support system, hotline, or service to address their numerous and frequent problems with Defendant's MP3 Program.

73. After continuous requests and pleas from Plaintiffs to address their concerns with the MP3 Programs, Defendant claimed they would provide Plaintiffs with "assigned coordinators" at each facility to focus on these issues.  However, these "coordinators" were openly hostile to any and all claims, frequently refusing to meet with Plaintiffs or address any of the complaints forwarded to them.

74. Plaintiffs have collected thousands of denials of claims, and thousands of instances of Defendant's refusal to address or correct issues with the MP3 Program.

75. The success of Defendant's MP3 Program is predicated upon the belief that consumers were purchasing products they could own and use forever, throughout their incarceration and upon their release. Products purchased throughout the MP3 Program would be of substantially less value if they were to expire at the termination of the MP3 program.

76. These representations were made through Defendant's advertisements and representations to prisoners, as well as through representations made by numerous employees and Defendant's representatives, whereby Plaintiffs were frequently induced and driven to make purchases through the MP3 Program.

77. However, the MP3 Program Defendant's advertised, marketed, and sold to consumers contained products, content, and services that were not as they were represented to be.

78.The products, content, and services provided by Defendant's MP3 Program, which originally was thought to be permanent, actually had an expiration date, as Defendant conspired to unexpectedly, and without warning, terminate the MP3 Program, leaving Plaintiffs with no recourse to remedy the situation and maintain control and access over content, products, and services purchased through the MP3 Program.

79.As with all products, content, and services purchased through the MP3 Program, Defendant deceptively failed to disclose throughout the years of the MP3 Program running, and collection of fees from Plaintiffs, that at the conclusion of the MP3 program, Plaintiffs would no longer have access to the millions of dollars' worth of content, products, or services that they purchased from Defendant.

## C. DEFENDANT'S MP3 PROGRAM CONTAINED NUMEROUS DEFECTIVE PRODUCTS, CONTENT, AND SERVICES

80.After cornering the MDOC's music market, and all available options for MDOC consumers to purchase music products, content, and services with the monopolistic nature of the MP3 Program, Defendant sold Plaintiffs knowingly defective products.

81.After the initiation of the fraudulent MP3 Program, Defendant stopped the sale of quality cassette players, CD players, and radios, restricting Plaintiffs' options to purchase products, content, and services outside of Defendant's control.

Defendant "switched" from selling quality, name brand products, to cheap, lesser quality players that were of lesser quality, prone to breakage, and frequently damaged cassette tapes.

82. Additionally, Defendant began to sell and market knowingly defective earbuds made of cheap, low-quality materials that would frequently break and crack open because of weak glue seals. These frail cords were priced at an exorbitant rate of $10.00 per pair.

83. Defendant maintained a monopoly on all of their products as inmates were barred from purchasing better quality content, products, and services after the initiation of the MP3 Program.  Plaintiffs were only permitted to purchase the defective products, content, and services from Defendant, which would often only last a matter of days.

84. Defendant's deception and sale of knowingly defective products, content, and services extended into charging exorbitant rates for often unnecessary products, content, and services.  This procedure is exemplified in Defendant's process of releasing "new" MP3 Players, and marketing these players and their "new" features to Plaintiffs. These "new" MP3 Players each were riddled with extensive issues and defects.

a.     THE ACCESS "SEC-100" PLAYER

85. In the fall of 2008, Defendant touted the release of their Access "SEC-100" player which was to be used in conjunction with Defendant's Music Warden kiosks.

86. Problems and defects with the system and the device were apparent from the beginning, including:

    a. The headphone jacks were mounted by only a single solder point to the circuit board, resulting in a fragile and extremely breakage-prone product, even with the minimal stress of installing and removing headphones or earbuds. This led to thousands of players becoming quickly useless, as the cheaply manufactured product would break easily. While Access initially denied this, they later sold the same cheap player with three solder points to address this "problem that did not exist." Such themes are common in throughout Defendant's practices.

    b. The rechargeable battery in the SEC-100 was poorly mounted, susceptible to overheating, and prone to fail to retain a charge, thus resulting in the frequent disabling of the player. Additionally, the battery was mounted in such a defective manner that it caused expansion and cracking of thousands of screens. As common throughout this Complaint, Defendant invariably blamed these defects on the Plaintiffs, absent any evidence to this effect. Furthermore,

Defendant also refused to offer any service to perform even simple battery replacements.

c.  The accompanying Music Warden kiosk system and software were rampant with glitches and viruses that often ruined or completely shut down tens of thousands of devices, causing numerous issues, including, but not limited to:

    i.  MP3 Player memory being wiped out;

    ii.  Purchased song content unlawfully and unexpectedly removed from the MP3 Player;

    iii.  Shorted batteries;

    iv.  File and download information removed;

    v.  Timing clocks in the players malfunctioning or terminated;

    vi.  Failure to recognize accounts, funds, content, and specific purchases orders;

    vii.  Frequently deleted orders, which were often processed anyway, resulting in an unlawful charge to Plaintiffs without receiving any purchased content; and

    viii.  Continuously shut down MP3 Players and Music Warden Kiosks completely, for lengthy periods, during which Plaintiffs were unexpectedly denied access to any and all of their purchased

content, products, or services.  Because of these defects, the MP3 Players' "security timers" would constantly elapse, thus depriving Plaintiffs of their paid content, files, information, messages, etc., all while falsely alleging that the system was functioning properly and "delivering" music.

d. The software on the SEC-100 had multiple defects, including, but not limited to, defects which caused:

   i. Thousands of instances of the unpredictable deletion of Plaintiffs' music;

   ii. Thousands of mistaken purchases, as Plaintiffs could not read the "full label" of a song, artist, album, etc. on the defective MP3 Player;

   iii. The MP3 Player could not read the portion of the file that identified a "modified," "re-recorded," "alternate version," "live," "radio edit," "re-mastered," "orchestral," etc. labeling of the song, resulting in thousands of cases where the MP3 Player did not correctly display the purchased content. For example, in many instances Plaintiffs would purchase a song from Defendant represented to be from a popular band, only to find out after the purchase that in fact, it was not even the original artist

performing the selection, but a "copy," or a "tribute," from a lesser known, lesser-quality band;

iv. The defective SEC-100 MP3 Player also could not read the time or length of the song purchased, thus leading to thousands of instances where Plaintiffs would be induced into a purchase, expecting to receive a full, completed version of the song, only to instead deceitfully receive a 5 second to 30 second "version" of that song, such as only the song's "introduction," "hook," or "outro," despite being represented to be the full and complete song;

v. The SEC 100 MP3 Players were erroneously loaded with a type of "cellphone" or "cellcore" software, which is not designed to run a system like the Defendant maintained, resulting in numerous issues as explained throughout Plaintiffs' Complaint;

vi. The standard "auto volume" feature found across all of Defendant's MP3 Players did not function in the SEC-100's, leading to countless incidents where the volume on Plaintiffs' and the Class' MP3 Players went from a normal, comfortable level, to an unexpectedly and painful deafeningly loud volume level.

87. Tens of thousands of Plaintiffs who purchased the SEC-100 were not only denied any relief by Defendant, but were literally forced to buy another player at the astronomical rate of $136.50, for the same device that is routinely sold to outside consumers at a retail price of $10.00, or forever lose access to all of their purchased content. When the SEC-100 would fail, and all were inevitably doomed to fail, Plaintiffs were forced to purchase another MP3 Player from Defendant in order to simply to re-obtain and maintain control of their purchased content, music, products and services.

88. Defendant held Plaintiffs' purchased products, content, and services hostage as they issued thousands of letters refusing to repair or replace flawed devices, all while demanding the Plaintiffs "buy another player and Access would graciously return their musical content."

   **b.   THE ACCESS "AMP'D MAXX PLAYER**

89. While Defendant continuously denied any "problems" or "flaws" with their SEC-100 MP3 Player or Music Warden kiosk software or system, Defendant replaced the SEC-100 with the "AMP'd Maxx" (4 or 8gig memory) device, leading to even more problems and losses for Plaintiffs.

90. "Coincidentally," this device addressed many of those same, earlier, "non-existent" problems that Plaintiffs complained about, and Defendant denied

existed, including, but not limited to, MP3 Players being able to read song data, time limits, variations of a song, and the entire song name.

91. Defendant's "AMP'd Maxx" MP3 Player again cost Plaintiffs the exorbitant rate of $137.50, despite the "AMP'd Maxx" model being an even cheaper, non-rechargeable device, absent many of the features that supposedly "justified" the exorbitant prices of the SEC-100, such as a clock, equalizer, year-search features, multiple languages, reset function, and more (including Wi-Fi).

92. Defendant's induced Plaintiffs to purchase the "AMP'd Maxx" MP3 Player by touting a new radio feature. However, the radio feature on the "AMP'd Maxx" was as useless and defective as the one in the SEC-100, as it was unable to locate or hold even local stations. Regardless, Defendant billed the radio as an essential feature, inducing destitute Plaintiffs to purchase this new player because "even if you don't have money for more music, you can use the digital radio to continue listening to music, sports, etc."

93. While Access attempted to deny the uselessness of the radio feature, they also changed their original included earbuds to ones lined with an "antenna material," advertising that this upgraded feature would "enhance reception." It did no such thing.

94. Where the Sec-100 ran on a rechargeable lithium battery, critical to poor prisoners who often cannot afford regular battery purchases, Defendant, in act of

fraud and conspiracy, modified the "AMP'd Maxx" MP3 Player prior to selling to Plaintiffs in order to drive battery sales.  Defendant's modifications to the "AMP'd Maxx" MP3 Player resulted in the player having a "new backplate" which was cast to run the device on "AA" batteries. Defendant simply soldered over the original lithium rechargeable port and replaced the rechargeable functionality with a port that required the device to run on batteries.

95. The MDOC, through their Access Commissary Contract, was the sole provider of batteries to prisoners, and the sole source through which they could purchase batteries.  Thus, this modification to the "AMP'd Maxx" MP3 Player forced the sale of likely hundreds of thousands, if not millions, of batteries, again at far-beyond-market prices.  This abuse, deception, and conspiracy to defraud consumers was exacerbated when the MDOC suddenly refused to allow Plaintiffs to purchase the very same rechargeable "AA" batteries that Defendant had previously sold.

96. The actions of Defendant, in removing features promised or used to induce Plaintiffs to purchase the SEC-100 and the AMP'd Maxx MP3 Players, which allegedly "justified" the outlandish price of these devices, constitutes both fraud and breach of express and implied warranty against tens of thousands of Class Members like Plaintiff Kensu who purchased the original devices based on those promises.

97. Each and every MP3 Player sold by Defendant had "timer clocks" which count down 30-day periods. If a Plaintiff owning the Player does not plug his device into a functioning kiosk within that 30-day window, his player would shut down and refuse to turn on. When Defendant learned that the SEC-100's often could be turned back on, by simply draining the battery and recharging the player, they "created a new adapter" and installed software that saved to the player. This new software permitted Defendant, without notice to Plaintiffs, to add or remove content from Plaintiffs' devices, illegally, often resulting in economic loss for Plaintiffs.

98. Thus, the "new" AMP'd Maxx not only required batteries, even when used with an adapter, (which is literally unheard of in electronic devices; the whole point being with an adapter, you do not need batteries in otherwise battery powered devices), but Defendant shamelessly programed Plaintiffs' MP3 Players so that the players' batteries had to be at 50% or better for the player to even turn on. In an obvious and shameless attempt to drive MDOC battery sales, and a completely unnecessary "function" in any device, Defendant conspired to force Plaintiffs to constantly and continuously purchase batteries. Defects in this same poorly-written firmware lead to thousands of devices failing, refusing to turn on, or claiming they were "disabled and must be connected to the kiosk," which then would not recognize them.

99. When pressured with complaints, Defendant's response to these issues was to deny any liability for the failings in their devices, kiosks, adapters, and firmware, and to claim that the thousands of Plaintiffs' players were "out of warranty," repeating the continuous cycle of shameless demand that Plaintiffs simply "buy another player and they would get their music back."

### c.   THE ACCESS "MAXX-PRO" PLAYER

100. In 2014, with absolutely no notice or reason provided, Defendant again "changed" the preferred player in the MP3 Program, touting the "new" "MAXX-PRO." Incredibly, this "new" player was the exact same device as the AMP'd Maxx MP3 Player, only much, much larger. Identical in shape, form, and features, but ridiculously large in size, the only other legitimate difference between the MAXX-PRO device and the AMP'd Maxx, besides the size, was that the MAXX-PRO required an obscene four "AA" batteries instead of two.

101. This change, as a product of Defendant's conspiracy to induce battery purchases, resulted in Plaintiffs being forced to purchase more batteries, larger cases, larger screen covers, armband sets, etc., all from Defendant. All the negative and defective aspects of Defendant's previous MP3 Players remained, including nearly useless radio, software glitches, and firmware failing. Additionally, contrary to Defendant ridiculous assertions and representations that Plaintiffs could get "100 hours of use" out of these devices, the truth was

these devices drank batteries like water, rapidly draining devices' battery power, even with minimal use.  Despite a lack of meaningful change or improvement to these "new" devices, Defendant continued to charge Plaintiffs the same price-gouging rate of $137.50, at a time when even Apple iPods with every possible feature had gone down to an average of $40.00.

102.   Because of the MAXX-PRO's increased size and heavy weight, (with the mandatory four batteries and no increase in power or processing features, and thus no "need" for additional batteries), the "new" device was much more prone to falling, breakage and harm. Like Defendant's prior devices, the MAXX-PRO was manufactured of incredibly cheap transparent plastic akin to the material used in cassette tapes cases, which are well known for their fragility.

103.   Plaintiffs assert that this cheap and defective design and production was a deliberate and intended result by the Defendant. Besides the proof that they chose the device and design specifications, (as admitted by Access and the MDOC in the past), the new "JPay player" that is currently offered by the MDOC through the new JPay program is not only made of heavy Lexan plastic, which is resistant to breakage, but it also comes with a large, heavy "cellphone type" case that protects it, a "touchscreen" with multiple protectors, and a raised bumper. As further proof of the Plaintiffs' and the Class' unjust enrichment, fraud and price-gouging claims, JPay charges Plaintiffs only $20.00 for this far,

far superior android platform touchscreen device, which provides numerous features far beyond the player that Defendant still charges $137.50 for.

104.   As with the AMP'd Maxx, Defendant demanded that the Plaintiffs purchase a "new," "different adapter" for use with the MAXX-PRO. This "new" adaptor was identical to the adaptor used by the SEC-100 MP3 Player, an adaptor that most members of Plaintiffs and the Class still had access to. Defendant falsely deceived Plaintiffs into believing that the SEC-100 adapter would "damage" their "new" players. This was, in fact, an absolute fabrication. Both adapters were identical in power, wattage, connections, amperage, cyclic rate, voltage, etc., and thousands of prisoners used the original adapters with all three devices. The simple truth was that the Defendant found a way to scam an additional $5.00 from thousands of Plaintiffs by claiming they "had to have the new adapter." Defendant simultaneously stopped selling the original adapter to drive sales of the identical, yet marketed as different, more expensive version.

### d.    THE ACCESS "MUSIC WARDEN" KIOSK SYSTEM

105.   The crux of Defendant's defective MP3 Program was the Music Warden kiosk system, which required Plaintiffs to frequently connect their individual MP3 Players to Defendant's Music Warden kiosk system anytime they wished to activate, update, purchase content, or receive purchased content.

106.    Defendant's Music Warden system was an automated computer kiosk system with multiple USB plugs which Plaintiffs could connect their devices (up to four at a time) and connect to Defendant's MP3 Program network.

107.    Assuming the kiosks were operational that day (which they often were not), once a user would connect his MP3 Player to the Music Warden kiosk, the system would allegedly "run a check" and update the "clock" on the devices to permit the user to continue to use the MP3 Player,

108.    The main defect with Defendant kiosk system that after this update, the Music Warden kiosk system would remove funds, without notice, from Plaintiffs' account, charging them for music queued in a "wish list" feature. Throughout the duration of Defendant's MP3 Program, Plaintiffs were continuously, wrongfully, and without notice, charged for content they did authorize or intend to be purchased.

109.    If the music was available at the time of plug-in, after charging the Plaintiffs, it would automatically load the content onto the player. If the items ordered were not available for instant download to the player from the kiosk system, the system would "order" them from a distant location (originally "SecureMedia" in Sterling Heights, Michigan), and the "purchaser" would receive it in a timeframe ranging from a few hours to a few days.

110.  Despite charging Plaintiffs astronomical prices and exorbitant fees for content, products, and services through the MP3 Program, Defendant's system lacked many basic features that would ensure accurate and effective functioning.

111.  First, Defendant's Music Warden kiosk system had no "shopping cart" feature, a standard feature normally found on all such devices and similar programs.

112.  Further, due to a defective and outdated system, any legitimate or intended purchase would take anywhere from a few days to over a month to charge or "clear" the purchaser's account. This delay in processing caused frequent and incessant problems.

113.  If Plaintiffs liked a song, they would move items they were considering into a "download manager." After moving songs into the queue, if he or she connected their MP3 Player to the system, without notice, the Music Warden system would automatically withdrawal all the users' funds to cover any songs placed in the "download manager." Further, if the user had content placed in "considered wishlist" feature, the system would simply start buying all the content listed, with no way for the user to stop unwanted charges.

114.  Despite numerous requests for refunds and pleas to fix this glitch in the system, Defendant refused to fix this problem, as this issue was a constant stream

of revenue for Defendant, leading to hundreds of thousands of unwanted or incorrect purchases, which Defendant would refuse to correct or credit.

115.   The rampant issues across Defendant's MP3 Program took advantage of and targeted Plaintiffs.   Many prisoners, having no experience and very limited access to such technology, were abused by constant unwanted, unwarranted, and unnecessary charges, with no recourse to address these issues. Many individuals taken advantage of by Defendant's MP3 program were elderly, mentally hampered in varying ways, and suffered from learning disabilities. Defendant's MP3 Program operation, management, and representations to Plaintiffs took none of this into consideration, failing to provide basic instructions on how to use these the devices, products, and services offered. For example, one elderly prisoner mistakenly bought eleven copies of the same song because of the confusing and defective purchase system.

116.   In addition to a defective product purchasing system, Defendant's Music Warden kiosk system regularly wiped and deleted all purchased MP3 content from Plaintiffs' MP3 Players upon connection to the kiosk system.  After each loss, while Defendant claimed to reimburse and reload the lost content onto Plaintiffs' players, numerous songs were either never returned and worse, Defendant would claim the purchase for a contested song never existed.

117. Though Defendant's advertised and represented their Music Warden kiosk system to run "four devices," allegedly allowing four individuals at a time use the system, it became well-known to users of the MP3 Program that as few as two devices would "overload" the system, even while dozens of prisoners waited to use the kiosks. As par for the course, Defendant refused to ever correct or even address the problems that resulted from this defect, continuing to leave "four cables" out for prisoners to connect to, leading to many more player shut-downs, kiosk freezes, and deletions of purchased content.

118. Plaintiffs frequently purchased content from Defendant that would never be received by Plaintiffs. Defendant Music Warden kiosk systems would regularly claim that Plaintiffs received purchased music that they did not receive, claiming the content was "downloaded" previously, or that they had songs on their player that were in fact, not there. This led to frequent disputes which Defendant never addressed.

119. As the MP3 Program continued, Defendant's Music Warden kiosks actually performed worse and worse throughout the contract period. The MP3 Program was rampant with many viruses, an issue admitted by Defendant, but never properly addressed, despite causing the ruin of thousands of players.

120. Additionally, problems with the viruses caused multiple "music catalogs" to be "jammed together" into an often unsearchable, and unusable mess. In turn,

this issue had a tremendous effect on the "already purchased" feature, resulting in thousands of incorrect or "repeat" purchases. On the consumers' MP3 Player, if one accidentally attempted to purchase a song they already owned, the MP3 Program functionality was supposed to stop the purchase, alerting the user that the content was "already on the player." Also, below each song the consumer already owned, the functionality was supposed to include a "purchased notice," alerting the user if they already owned that specific song. Early on in the MP3 Program, this feature failed. After Defendant refused to address or fix the problem, Defendant wrongfully profited from thousands of incorrect or "repeat" purchases; another driver of ill-gotten gains.

121.   Another defective issue with Defendant Music Warden kiosk system came from the songs the system randomly chose to load and purchase for Plaintiffs. While Plaintiffs would list desired or contemplated song purchases in an order of purchase preference on their "download manager," and though the system advertised and represented to load and purchase them in that manner, the Music Warden kiosk system would often "randomly" pick which songs to load and purchase, ignoring the preference ranking system in the download manager. As common throughout Defendant's MP3 Program, this malfunction led to thousands and thousands of incorrect purchases and the unjust enrichment of Defendant.

122. This defective issue, like many throughout Defendant's MP3 Program, progressively worsened over time and was permitted by the Defendant, forcing Plaintiffs to spend more money to purchase the content they actually wanted and attempted to purchase in the first place.

123. Defendant's Music Warden kiosks would regularly, allegedly "update," claiming they "added new content" to their "catalogs." In actuality, Defendant maintained shifting "sets" of "catalogs," with no notification to Class Members of any "changes."

124. For example, a consumer might have 100 songs in his or her "wish list." The consumer would add funds sufficient for the top 30 choices. The "new," "updated" catalog might not have any of these items, items that the system just told the consumer it did have (thus inducing his or her order). Defendant's Music Warden kiosk system would remove all of the funds from the consumers' account and move on to purchase for the consumer the less-desired purchases on their wish list. Because Plaintiffs could not stop this process and had no notice of what was happening, or ability to confirm these purchases, Plaintiffs suffered enormous financial losses.

125. While Defendant represented that "catalog updates do not affect memory," in actuality, because the catalog system became so "jammed" while mixing old and

new content, as the system attempted to the load the alleged "new catalog," the defective system would simply pile material on top of itself.

126.   The effect of this failure and defect caused many members of Plaintiffs, whose MP3 Players' memories were near full, to completely lose stored content. Because Plaintiffs were 'slaved' to the kiosk, they were forced to connect and update their devices.

127.   For example, when a consumer would connect their MP3 Player to Defendant's Music Warden kiosk, the defective system would tell the user it "could not connect," or it would claim a "failure" of an attempt to "update player." In several cases, after a protracted, several-month battle, consumers were finally told by Defendant that they would have to delete their content to update the software of their defective MP3 Player. Thus, Plaintiffs' only "option" was to remove all of their purchased content in order to update the defective player. For example, if a consumer had 100 songs on the MP3 Player, 100 songs which the consumer paid $1.48 each for, if that consumer wished to continue to participate in the MP3 Program and use the defective $137.50 MP3 Player, they would be forced to delete all the purchased content, lose $148.00 in music, all to update Defendant's defective software.

128.   Defendant refused to compensate Plaintiffs for this loss, just as they refused to compensate Plaintiffs for the numerous instances of malfunction and defects that caused the improper purchase, deletion, and malfunction of MP3 content.

129.   Even after Defendant claimed they "updated" and repaired the defective kiosk system, "glitches" and malfunctions consistently wiped out and erased Plaintiffs' playlists and song selection lists, which were often comprised of weeks or months of searches, ordering, and research, consisting of hours upon hours on the tiny alphabet keyboard on the players, each and every time they plugged in. This, like so many other problems, only worsened over time.

130.   Defendant deliberately decided to remove, or not include, the "reset switch" that was on the initial SEC-100, which permitted the Plaintiffs' to "reboot" their players when defective kiosks and software "killed" them. This deliberate act resulted in thousands of instances where Plaintiffs would have to ship their players to Defendant for repair, only to Defendant tell them, "your device is out of warranty." This notice was accompanied by the attendant "ransom demand" of $137.50 to purchase a new player and "get their music back." Even with thousands of Class Members returning devices that were clearly not damaged, worn, altered, or otherwise visibly defective, and letters clearly explaining that their players worked fine until the moment they plugged in, Defendant refused to accept any responsibility in 99% of the cases. Defendant not only refused to

offer a repair service, but they gave only 30-day warranties on these cheap, defective products.

131. Defendant's Music Warden kiosks use "phantom power," or small amounts of power to run devices, while plugged into the kiosks. This function caused many consumers' devices to be destroyed by apparent power surges, where the battery would rupture almost immediately after plugging into a kiosk.

132. The Music Warden kiosks viruses transmitted to consumers' MP3 Players caused them to fail in other ways. In numerous instances, players would "freeze" each time consumers attempted to search for any large file. This would often result in hours or days of the consumers' device being "locked." While this was sometimes correctable with the SEC-100's, as they had the "reset" feature, Defendant chose to deny this feature in the later models, again, without reason, though the Plaintiffs assert that it was done solely to drive "replacement sales," as the minuscule (and almost unheard of) "30-day warranty" would expire, often long before a plaintiff could even return the device to Defendant.

133. Finally, Defendant's Music Warden kiosks would regularly "freeze" while Plaintiffs' MP3 Players were connected. As a consumer's MP3 Player could not be removed before finishing the update process without Defendant's software automatically disabling the player, this "freeze" would then disable the MP3 Players of all those connected. Plaintiffs would thus either remain "trapped" at

kiosks for hours on end, hoping their player would "wake up," or because of movement rules in prison, and mandatory limitations on time, Plaintiffs would be forced to disconnect their players, effectively disabling, sometimes permanently, their devices.

## D. THE TERMINATION OF DEFENDANT'S MP3 PROGRAM, RESULTING IN THE VIOLATION OF PLAINTIFFS' AND THE CLASS' FUNDAMENTAL RIGHTS

134.  After years of defects, malfunctions, fraudulent inducements and charges, Defendant's unexpectedly agreed to terminate the MP3 Program, forcing inmates to switch to a substantially similar program run by the company JPay.

135.  After the termination of the MP3 Program, MDOC and JPay refused to transfer Plaintiffs' and the Class' lawfully owned and purchased content from the MP3 Program over to the new JPay program.  This refusal was an obvious effort to further their money-grab, requiring Plaintiffs and the Class to purchase "new" content through the JPay program, or simply re-purchase content they already lawfully owned through the previous MP3 Program.

136.  While Defendant advertised, represented, and promised any and all content purchased through the MP3 program would "always be available for re-order at any time" the purchaser desired it, after the switch to JPay, Defendant refused to ensure that Plaintiffs and the Class had sufficient, functioning players to hold

all the content they lawfully purchased, as well as access to their lawfully purchased content which was held on Defendant's digital network.

137.   Upon termination of the MP3 program, the Music Warden kiosks were removed from Defendant's facilitates.  After removal, Plaintiffs had no access to the millions of dollars' worth of MP3 music, products, and content available on the kiosk and Defendant's digital network. Defendant thus denied Plaintiffs their paid-for content, the opportunity to reset and repair their MP3 Players, and any option for refunds.

138.   After JPay installed their new JPay kiosks in MDOC facilities, Defendant and JPay conspired to refuse any access or compatibility of the previous MP3 Program MP3 Players on JPay kiosks.

139.   Additionally, at the termination of the MP3 Program, Plaintiffs were refused access to purchasing replacement MP3 Players from the previous MP3 Program. As the cheap MP3 Players were doomed to progressively fail, the only option available to Plaintiffs in order to keep their current access to their lawfully purchased content was to keep their existing MP3 functioning, or purchase another player to use in the event their MP3 Player broke.

140.   By denying access to another MP3 Player, Plaintiffs were denied millions of dollars in purchased content, even though Access still has these players available, and though there are numerous, cheap players available that would

hold this data. This action alone deprives Plaintiffs, without any due process, of millions of dollars in digital property, clearly identified as protected by Congress in the Millennium Digital Copyright Act and others.

141.   Upon termination of the MP3 program, the only resolution offered by Defendant was to provide Plaintiff with the "option," for a fee, to permit Plaintiffs to "voluntarily surrender" their MP3 players to Defendant. Upon surrender, Defendant "resolution" offered to make Plaintiffs and the Class a Compact Disk ("CD") containing any and all MP3 content and services purchased through the MP3 Program. Defendant would then have the CD "mailed to an outside party."

142.   After the surrender of their MP3 player, Plaintiffs would no longer have access to their lawfully purchased content, products, and services. In addition to surrendering their MP3 players, and the content contained on that MP3 player, they would not have access to the CD version of that MP3 content, as Defendant required Plaintiffs to agree to have the CD sent to an outside party (somehow not currently incarcerated by the MDOC).

143.   Plaintiffs' MP3 players, which were only available for purchase through Defendant's MP3 Program, were Plaintiffs only option for storing, accessing, and maintaining their lawfully purchased content, products, and services.

144.   Numerous Plaintiffs did not have an outside party to send CD version of their content to or anyone who could meaningfully make use of this offer.

145.   For example, Plaintiff Kensu's wife had passed away. This "resolution" gave Kensu the "option" of 1) paying "for the privilege" of sending his music to his 75-year old adopted parents, or possibly his lawyer in this litigation, or 2) refuse to surrender his MP3 player and hope that he could maintain the defective MP3 player long enough to enjoy access to his lawfully purchased content.

146.   This resolution offered Plaintiffs no meaningful choice regarding securing the long-term security of their lawfully purchased content, products, and services. Plaintiffs could either 1) pay Defendant more money, in addition to all of the money they already spent purchasing the content from Defendant, for the chance to surrender their lawfully purchased property to Defendant to have their products, content, and services transferred to a CD, which they would then have to transfer to an "outside party," essentially losing access to any and all content, products, and services purchased through the MP3 Program; or 2) refuse to surrender their property to Defendant, and hope to maintain their defective MP3 player, which was doomed to fail, for as long as possible, so that they could maintain ownership and control of their own property.

147.   The deceitfulness of "resolution" is furthered by the 'deathclock' technology installed across all of the MP3 Program's MP3 Players. Each MP3 Player

purchased through the MP3 Program contained a "deathclock" a program which completely shut down, and essentially rendered the MP3 Player permanently disabled, if the MP3 Player was not plugged into one of Defendant's Music Warden Kiosks before the "deathclock" expired.

148.   During the duration of Defendant's MP3 Program, Defendant's MP3 Player's "deathclock" was set to a 30-day period, requiring Plaintiffs and the Class to connect their MP3 Players to Defendant's Music Warden kiosks in order to avoid losing access to all of their products, content, and services.

149.   In the event that a purchaser is released from prison, despite having the ability to permanently disable the "deathclock" program and functionality, Defendant refused to "disable" the "deathclock," or "unlock" Plaintiffs MP3 Players, unless Plaintiffs agreed to pay Defendant the exorbitant fee for the "privilege" of maintaining access to their lawfully purchased content.

150.   Additionally, in an act of extortion and abuse of Plaintiffs, Defendant conspired to inexplicably raise the fee from $10.00 to the exorbitant rate of $25.00. Plaintiffs make, on average, $15.00 *per month* across Michigan prisons.

151.   At the conclusion of the MP3 Program, all of Defendant's Music Warden kiosks were removed from all MDOC facilities.  Thus, Plaintiffs and the Class would only have access to the content, products, and services purchased through

the MP3 Program for the duration that remained on their MP3 Player's "deathclock."

152.   Upon termination of the MP3 Program, this willful abuse of Plaintiffs, and furtherance of the forceful nature of their money-grab, continued as Defendant instituted a policy to refuse to disable the "deathclock" on the players purchased through the MP3 Program, instead choosing to increase the "limit" from 30 days to 3650 days.

153.   The functionality of the "deathclock" allowed Defendant to control the time and duration of the "deathclock," which could be set for any number of days, "set to infinity," or entirely disabled.

154.   This policy ensured that no matter what, even in the event that Plaintiffs perfectly maintained their MP3 Players purchased through the MP3 Program, they would eventually lose, and be deprived of, any and all content or services stored on that MP3 Player, which would effectively become useless, at the conclusion of 3650 days.

155.   Thousands of Plaintiffs have more than 3650 days left to serve on their sentences.

156.   As the final days of Defendant's MP3 Program approached, and termination was imminent, Plaintiffs were repeatedly encouraged to "plug in" their devices to a Music Warden kiosk in order to "get all their music back." This

encouragement induced thousands of members of Plaintiffs and the Class to erroneously "plug in" and update their players. Incredibly, following this final plug in, thousands of prisoners found their devices failing due to this update. Defendant refused to repair or replace players damaged by this final update, despite later admitting that "problems arose when plugging into the kiosks," which they claimed would be "resolved." Thousands of Plaintiffs' devices were ruined in these "end days," ranging from issues such as, but not limited to, screen malfunctions, all written data disappearing, and music and content disappearing.

157.   This practice and policy was not disclosed to Plaintiffs prior to, or during, their purchases made within the MP3 Program.

158.   This practice of omission of the omission of material facts regarding the MP3 Program purchases is common to all products, content, and services purchased from Defendant's MP3 Program.

159.   Because Defendant deceptively chose to omit material facts regarding the kind, quality, duration, and function of the products, content, and services they sold in the MP3 Program, Plaintiffs were led to believe they were purchasing into a program that offered premium, authentic products, content, and services, available for use indefinitely, when in fact, Plaintiffs were essentially purchasing a much less desirable product which contained an expiration date.

160.   By following a practice where Defendant represented the products, content, and services purchased through the MP3 Program to be of high quality, theirs to own, and available for use indefinitely, while simultaneously failing to disclose that purchasers would no longer have access to any products, content, or services purchased through the MP3 Program or used through the services provided by the MP3 Program should the MP3 Program end, as well as refusing to answer direct questions about the MP3 Program, Defendant deceive consumers into believing they are purchasing products, content, and services that are substantially different and less valuable than the product received.

161.   There is a substantial difference between the value of a product, content, or service purchased through the MP3 Program that will be available to the purchaser not only throughout the duration of the MP3 Program but as well as upon completion of the program and upon release from prison, and the value of a product that will cease to exist, or the purchaser will cease to have access to, at the conclusion of the MP3 Program. The value of a product, content, or service that will cease to exist or the consumer will cease to have access to is substantially less than a product, content, or service that the consumer can utilize and enjoy throughout their lifetime.

162.   This failure to disclose material aspects of the MP3 program leads consumers to believe they were purchasing products, content, and services which were

substantially more valuable and desirable than the product they ultimately received.

163.   Labeling and representing these products to consumers as theirs to own upon purchase is extremely misleading, as consumers are unknowingly induced into purchasing less desirable, less useful products, content, and services, expecting the quality and the implied warranty that these products, content, and services will be accessible to the consumer forever.

164.   Defendant's labels, advertisements, and representations throughout the MP3 Program are false, misleading, and reasonably likely to deceive the public.

165.   Accordingly, by failing to specify material aspects of the products, content, services, and features in MP3 Program advertisements and representations, and failing to disclose that upon the conclusion of the MP3 Program consumers would no longer have access to the purchases they made through the MP3 Program, Defendant misrepresent to consumers that the MP3 Program's products, content, and services they are purchasing have the quality, value, accessibility, and usefulness as represented.

166.   Plaintiffs suffered enormous economic loss as well as violations of their fundamental rights throughout the contract period of the MP3 Program, as well as the conclusion of the MP3 program, which unexpectedly ended when the MPOC abruptly switched to a program run by JPay.

167.   After the abrupt termination of the MP3 Program, Defendant refused to provide Plaintiffs any form of relief, repairs, or access to the millions of dollars' worth of content, products, or services lawfully and permanently purchased and owned through the MP3 Program.

168.   Defendant forced Plaintiffs and the Class to either abandon their lawfully owned property, dispose of it, or purchase new content from Defendant's new contract vendor, JPay.

169.   Defendant willfully and knowingly deprived and defrauded Plaintiffs out of millions of dollars in funds, property, and digital content, willfully breached contractual promises, and caused Plaintiffs, grievance, loss, and emotional and mental distress. Defendant refused to take any fair, considerate, or reasonable steps to address their legitimate concerns, losses, and enumerated rights.

170.   As a result of Defendant's conduct, consumers, including Plaintiffs, have purchased products, content, and services from Defendant's MP3 Program that misrepresented fundamental aspects of the fraudulent MP3 Program while inducing Plaintiffs' purchases, failed to disclose the deceitful and extortive nature of the program as a whole, the defective and deficient quality of the products contained, and how ultimately, without any due process, Plaintiffs would be deprived of their millions of dollars' worth of digital property at the termination of the MP3 Program.

## FACTUAL ALLEGATIONS SPECIFIC TO PLAINTIFF TEMUJIN KENSU

171.   During the duration of Defendant's MP3 Program, Plaintiff Temujin Kensu purchased approximately $3000.00 worth of content, products, and services from Defendant via their Secure Media MP3 Program.

172.   Throughout the duration of Defendant's MP3 Program, and during the times he purchased content, products, and services from Defendant, Defendant advertised, represented, and induced Mr. Kensu to believe that the content, products, and services he was purchasing were his to own, and would be accessible to him, forever.

173.   Unknown to Mr. Kensu, the products, content, and services he purchased through Defendant MP3 program actually had an expiration date; and upon termination of Defendant's MP3 Program, Mr. Kensu would no longer control or have access to his lawfully purchased content.

174.   Later, Mr. Kensu learned that the products, content, and services he purchased through Defendant's MP3 Program would not, in fact, be accessible to him after the termination of Defendant's MP3 Program.

175.   The value of the products, content, and services that contain an expiration date, and will cease to be accessible after a certain point, is substantially less than receiving products, content, and services that are owned and accessible to Mr. Kensu forever.

176.   Defendant marketed, advertised, solicited, represented, and sold products, content, and services through their MP3 Program to consumers in a manner that was inconsistent with the manner a reasonable consumer would believe a trusted business would conduct themselves.

177.   As a result of Defendant's deceptive and unfair practices regarding the marketing, advertising, and soliciting of products, content, and services sold through their MP3 Program, Mr. Kensu did not receive the quality, usefulness, and expected value of the products he purchased.

178.   Mr. Kenzo's dealings with Defendant in connection with the purchase of products, content, and services throughout Defendant's MP3 Program is typical of other customers of Defendant's MP3 Program.

179.   Mr. Kensu and all other members of the Class overpaid for Defendant's MP3 Program content, products, and services, because the product, content, or service received did not provide the benefits promised, as Defendant provided consumers with lesser grade, less desirable products, content, and services which would cease to be accessible when the program terminated, despite Defendant representing that consumers were purchasing content, products, and services, that were theirs to own, and would be accessible to them, forever.

180.   Defendant's representations as to the ownership and accessibility of MP3 products, content, and services they sold consumers were a material factor to

that influenced Mr. Kensu and other members of the Class' decision to purchase the products, content, and services from Defendant's MP3 Program.

181.   Mr. Kensu and other members of the Class would not have purchased the products, content, and services from Defendant's MP3 Program, or would have paid materially less for them, had they known that Defendant's representations of these products, content, and services were false and misleading.

182.   Mr. Kensu has continued to do business with Defendant because he is forced to do so as there is no available option.  Furthermore, Mr. Kensu still has content maintained by Defendant.

183.   Defendant has profited significantly from its false marketing and sale of products, content, and services represented to be of a different kind, quality, and nature, from the product actually received by the consumer.

## CLASS ACTION ALLEGATIONS

184.   Plaintiffs bring this action on their own behalf and on behalf of a proposed Class of all other persons similarly situated pursuant to F.R.C.P. 23(b)(2) and 23(b)(3). This action is brought by the named Plaintiff on behalf of all individuals who have been taken advantage of by Defendant's deceptive practices through their advertisements and representations, specifically, individuals who:

> Are or were prisoners incarcerated in facilities of the Michigan Department of Corrections and beginning in 2012, purchased

products, content, and services from Defendant's MP3 Program, represented by Defendant to be of a different kind, quality, and fundamental model than the program actually was.

185.   Excluded from the Class is Defendant; any entity in which it has a controlling interest; any of its parents, subsidiaries, affiliates, officers, directors, employees and members of their immediate families; members of the federal judiciary, and counsel for the parties.

186.   Plaintiff reserves the right to expand, limit, modify, or amend this class definition, including the addition of one or more subclasses, in connection with Plaintiff's motion for class certification, or at any other time, based on, *inter alia*, changing circumstance and/or new facts obtained during discovery.

187.   *Numerosity:* This class is estimated to be composed of between 25,000 and 50,000 Michigan prisoners who participated in Defendant's MP3 Program, and is therefore so numerous that joinder of all members is impracticable. The disposition of their claims through this class action will benefit all Class Members, the parties, and the courts and is the most practical method for Plaintiff to challenge the policies, procedures, and practices of Defendant.

188.   *Existence and Predominance of Common Questions of Fact and Law*: There are questions of law or fact common to the members of the class such that common questions predominate over questions affecting only individual members.  Individual questions do not predominate over common questions

because (a) each member of the Class was provided with the same or a substantially similar product, content, or service from Defendant's MP3 Program; (b) each member of the Class who purchased products, content, or services from the MP3 Program through Defendant was provided with less desirable products, content, or services; and (c) each member of the Class purchased products, content, or services represented to be of a certain kind or quality from Defendant's MP3 Program which was less valuable, desirable, and usable as represented by Defendant, because Defendant knew, misrepresented, and did not disclose that fundamental aspects of the fraudulent MP3 Program were substantially different than represented to be, while inducing Plaintiffs' purchases, and also failed to disclose the deceitful and extortive nature of the program as a whole, the defective and deficient quality of the products contained, and how ultimately, without any due process, Plaintiffs would be deprived of their millions of dollars' worth of digital property at the termination of the MP3 Program.

189. Furthermore, to assess each individual claim, only the amount of each purchase needs to be assessed. Thus, computation of damages for the Class can be readily conducted.

190.   There is a well-defined community of interest in questions of law and fact affecting the Class. These questions of law and fact predominate over individual Class Members, including, but not limited to, the following:

    a. Whether, during the Class Period, Defendant represented products to be of merchantable kind, quality, and character, and instead, provided consumers with less desirable, cheap, and unnecessary products, content, and services;

    b. Whether Defendant represented the MP3 Program to contain products, content, and services that, upon purchase, would be wholly owned, accessible, and controlled by the purchaser, forever, and instead, in inducing Plaintiffs and class members to purchase into the MP3 Program, failing to disclose that upon the program's termination, the products purchased could no longer be used, accessed, or controlled by purchasers, leaving them with relatively little or no value;

    c. Whether Defendant use of false and deceptive productive labeling constitutes false advertising under Michigan law;

    d. Whether Defendant engaged in unfair, unlawful, and/or fraudulent business practices under Michigan law;

    e. Whether Defendant misrepresented and/or failed to disclose material facts about the MP3 Program;

f. Whether Defendant has made false and misleading statements of fact concerning the fundamental quality and nature of the products, content, and services represented in the MP3 Program manufactured and/or sold by Defendant;

g. Whether Defendant's conduct, as alleged herein, was intentional and knowing;

h. Whether Class Members have been harmed by Defendant's conduct alleged herein;

i. Whether Class Members are entitled to damages and/or restitution; and, if so, what is the amount of revenues and/or profits Defendant received and/or was lost by Class Members as a result of the conduct alleged herein;

j. Whether Defendant was unjustly enriched by their deceptive practices;

k. Whether Defendant is likely to continue to use false, misleading, or illegal product labeling, advertising, and representations such that an injunction is necessary; and

l. Whether Plaintiffs and Class Members are entitled to an award of reasonable attorney's fees, pre-judgment interest and costs of suit.

191. *Typicality*: The claims of the Class Representative are typical of, and not antagonistic to, the claims, violations of law, and resulting harms suffered by all

Class members. Plaintiff and the Class have all been deceived (or were likely to be deceived) by Defendant's representations of the products, content, and services manufactured or sold in Defendant's MP3 Program.

192.   *Adequacy*: The Plaintiff Class Representative will fairly and adequately assert and protect the interests of the Class. Plaintiff's counsel knows of no conflicts of interest between the Class Representative and absent Class members with respect to the matters at issue in this litigation, the Class representatives will vigorously prosecute the suit on behalf of the Class, and the Class representatives are represented by experienced counsel.   Plaintiffs are represented by attorneys with substantial experience and expertise in complex and class action litigation involving the prosecution of consumer fraud and violations of consumer protection statutes.   Plaintiff's attorneys have identified and investigated the claims in this action and have committed sufficient resources to represent the Class.

193.   *Superiority*: The maintenance of the action as a class action will be superior to other available methods of adjudication in promoting the convenient administration of justice. Because of the modest size of individual Class Members' claims, few, if any, Class Members could afford to seek legal redress of the wrongs complained herein on an individual basis.   The prosecution of separate actions by individual members of the Class could result in inconsistent

or varying adjudications with respect to individual members of the Class. Absent class action, Class Members and the general public would likely not recover, or would not likely have the chance to recover, damages or restitution, and Defendant will be permitted to retain the proceeds of its misdeeds.

194.   All Class Members, including Plaintiff, were exposed to one or more of Defendant's misrepresentations or omissions of material fact, including Defendant's claims regarding misrepresenting fundamental aspects of the fraudulent MP3 Program while inducing Plaintiffs' purchases, failing to disclose the deceitful and extortive nature of the program as a whole, the defective and deficient quality of the products contained, and how ultimately, without any due process, Plaintiffs and the Class would be deprived of their millions of dollars' worth of digital property at the termination of the MP3 Program.  Due to the scope and extent of Defendant's consistent scheme, disseminated in a massive, years-long campaign to consumers via memos, posters, and representations to consumers, it can reasonably be inferred that such misrepresentations or omissions of material  fact were uniformly made to all Class Members. In addition, it can be  reasonably presumed that all Class Members, including Plaintiff, affirmatively acted in response to the representations contained in Defendant's product, content, and service

representations when purchasing products, content, or services represented to be other than anticipated from Defendant.

195.  Plaintiff is informed and believes that Defendant keeps extensive computerized records of its customers through the MDOC. Defendant has one or more databases through which a significant majority of Class Members may be identified and ascertained, and it maintains contact information, including email and home mailing addresses, through which notice of this action could be disseminated in accordance with due process requirements.

196.  A class action is an appropriate and superior method for the fair and efficient adjudication of the controversy given the following factors:

a.  Common questions of law and/or fact predominate over any individual questions that may arise, and, accordingly, there would accrue enormous economies to both the Court and the Class in litigating the common issues on a class-wide basis instead of on a repetitive individual basis;

b.  Class members' individual damage claims are too small to make individual litigation an economically viable alternative;

c.  Despite the relatively small size of individual Class members' claims, their aggregate volume, coupled with the economies of scale inherent in litigating similar claims on a common basis, will enable this case to

be litigated as a class action on a cost-effective basis, especially when compared with repetitive individual litigation; and

d. No unusual difficulties are likely to be encountered in the management of this class action in that all questions of law and/or fact to be litigated at the liability stage are common to the Class.

197. To the best of Plaintiff's knowledge, no other action is pending on the subject matter of this case in any Court.

198. As such, Plaintiff seeks class certification under F.R.C.P. 23.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201

199. Plaintiffs adopt by reference each and every paragraph of this Complaint as if fully copied and set forth at length herein.

200. All purchases of content, products, and services by Plaintiffs constitute an offer by Defendant to enter into a sales contract for Defendant's MP3 Program content, products, and services.

201. By purchasing items from Defendant's MP3 Program, Plaintiffs accepted Defendant's offer.

202. Plaintiffs' tendered payment to Defendant for content, products, and services in Defendant's MP3 Program. These payments constitute consideration.

203.   Accordingly, all transactions that are the subject of this Complaint are possessed of the three elements of a contract, i.e., offer, acceptance, and consideration.

204.   The contracts call for Defendant to provide access to Defendant's MP3 Program, whereby Plaintiffs purchased products, content, and services intended and represented to be wholly owned, accessible, and controlled by the purchaser, forever. Instead, at the conclusion of the MP3 Program, Defendant removed access, control, and the ability for Plaintiffs to maintain ownership over purchases.

205.   An actual and justiciable controversy exists between Plaintiffs and Defendant concerning whether Defendant actions removing access and control over lawfully purchased content, products, and services violates Michigan law.

206.   This claim for declaratory judgment is brought pursuant to 28 U.S.C. § 2201 *et seq.*, seeking a determination by the Court that: (a) this action may proceed and be maintained as a class action; (b) that Defendant's practices of removing access and control over lawfully purchased content, products, and services violates MCL 445.901 *et seq.*; (c) Class members are entitled to restitution and interest thereon; (d) an award of reasonable attorneys' fees and costs of suit to Plaintiffs is appropriate; and (e) such other and further relief as is necessary and just may be appropriate as well.

## SECOND CAUSE OF ACTION
## BREACH OF CONTRACT

207.   Plaintiffs adopt by reference each and every paragraph of this Complaint as if fully copied and set forth at length herein.

208.   The previously referenced purchases through Defendant's MP3 Program are contracts which have been entered into between Plaintiffs and Defendant.

209.   Pursuant to the referenced contracts and agreements between Plaintiffs and Defendant, Defendant was to provide Plaintiffs MP3 Program content, products, and services that would be wholly owned, accessible, and controlled by the purchaser, unconditionally, forever.

210.   Defendant was further obligated pursuant to the contracts and agreements to reimburse Plaintiffs for any defect, malfunction, or issue associated with the content, product, or service purchased through Defendant's MP3 Program.

211.   In exchange for these duties and obligations, Defendant received payment for the purchase price of thousands of MP3 songs, MP3 Players, and other products, content, and services purchased throughout the duration of Defendant's MP3 Program.

212.   The Plaintiffs have performed all of the conditions required of them under the contract.

213.   Defendant breached the contract with the Plaintiffs by adopting a practice where, upon the termination of the MP3 Program, Plaintiffs would be refused

ownership, access, control, and use over their lawfully purchased products, content and services throughout the duration of the MP3 Program, thus resulting in the consumer purchasing a product, content, or service worth substantially less than the product, content, or service Defendant was obligated to provide under the contract.

214.   As a result of Defendant's breaches of the contract, Plaintiffs are entitled to compensatory damages in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
## VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT UNDER MICHIGAN COMPILED LAWS § 445.901, ET SEQ.

215.   Plaintiffs adopt by reference each and every paragraph of this Complaint as if fully copied and set forth at length herein.

216.   The Defendant has, through their conduct described in this Complaint, violated the Michigan Consumer Protection Act, MCL § 445.901, *et seq.*, as unfair, unconscionable or deceptive methods, acts or practices in the conduct or trade or commerce are unlawful. *See* MCL § 445.903.

217.   Plaintiffs are considered "Persons" as that term is defined within MCL § 445.902(d).

218.   Defendant is a "Person" as that term is defined within MCL § 445.902(d).

219.   Defendant is engaged in "Trade or commerce" as that term is defined within MCL § 445.902(g).

220.   The acts, omissions, solicitations, representations, transactions, agreements and contracts at issue herein constitute "Unfair, unconscionable, or deceptive methods, acts, or practices in conduct of trade or commerce" as that term is defined within MCL § 445.903.

221.   Among other things, Defendant have engaged in unfair, unconscionable, and deceptive acts or practices in violation of MCL § 445.903 (1)(c), (1)(d), (1)(e), (1)(j), (1)(n), (1)(p), (1)(r), (1)(s), (1)(u), (1)(x), (1)(z), (1) (bb), and (1)(cc), when it non-exhaustively:

   a.   Advertised or represented promises in the MP3 Program, including, but not limited to, content, products, and services purchased throughout the duration of the MP3 Program would be wholly owned, accessible, and controlled by the purchaser, unconditionally, forever; and

   b.   Made false or misleading representations of facts or statements of fact material to the purchases made during the MP3 Program, including, but not limited to, promises that content, products, and services that would be wholly owned, accessible, and controlled by the purchaser, unconditionally, forever, such that the customer reasonably believed the represented services to be other than it actually is; and

   c.   Failed to disclose or concealed the true fraudulent nature of the MP3 Program, and the fact that at the conclusion of the MP3 Program,

consumers would be refused ownership, access, control, and use over their lawfully purchased products, content and services; and

d. Unexpectedly terminated the MP3 Program, effectively restricting Plaintiffs from any meaningful access, use, or control over their lawfully purchased content, with no recourse to challenge the effective seizure of their property.

e. Charged amounts far in excess of the list prices for the various items in an attempt to capitalize on the captive market of prisoners who were provided no meaningful choice of vendor and were those forced to pay these dramatically inflated prices or do without.

222. Defendant's conduct described herein repeatedly occurred throughout Defendant's trade or business and as such Defendant was capable of deceiving a substantial portion of the consuming public.

223. The facts concealed or not disclosed by Defendant are material facts in that Plaintiffs and any reasonable consumers would have considered those facts important in deciding whether to purchase products, content, and services from Defendant's MP3 Program. Had Plaintiffs known that Defendant would effectively seize any access, use, or control over their lawfully purchased content and products, they would not have purchased the content, products, and services from Defendant's MP3 Program.

224.   Defendant intended that Plaintiffs would rely on the deception by purchasing products, content, and services through their MP3 Program, unaware of the undisclosed material facts. This conduct constitutes consumer fraud within the meaning of the various consumer protection statutes.

225.   Defendant's unlawful conduct is continuing, with no indication that Defendant will cease.

226.   As a direct and proximate result of the deceptive, misleading, unfair and unconscionable practices of the Defendant set forth above, Plaintiffs are entitled to actual damages, compensatory damages, penalties, attorney's fees and costs as set forth under the Michigan Consumer Protection Act and Michigan law.

227.   Defendant's deceptive, misleading, unfair and unconscionable practices set forth above were done willfully, wantonly and maliciously entitling Plaintiffs to an award of punitive damages.

## FOURTH CAUSE OF ACTION
## VIOLATION OF 42 U.S.C. § 1983 – FOURTH AND FOURTEENTH AMENDMENTS: RIGHT TO BE SECURE FROM UNREASONABLE SEIZURE

228.   Plaintiffs adopt by reference each and every paragraph of this Complaint as if fully copied and set forth at length herein.

229.   By reason of their acts as set forth in this Complaint the Defendant acted under color of state law with oppression and malice to subject the Plaintiffs to the

deprivation of his rights, privileges, and immunities secured by the Constitution and laws.

230. The Fourth Amendment protects against unreasonable searches and seizures and the Fourteenth Amendment forbids the denial of life, liberty, or property without due process of the law.

231. The Fourth Amendment to the United States Constitution prohibits the government from unreasonably destroying or seizing a citizen's property.

232. The Fifth and Fourteenth Amendments to the United States Constitution guarantees Plaintiffs the right not to be deprived of life, liberty, or property without due process of law.

233. The Fourteenth Amendments to the United States Constitution guarantees Plaintiffs the right to equal protection of the laws.

234. Defendant and their employees and agents violated Plaintiffs' and the Class' rights to be free from unreasonable seizure of their property by terminating the fraudulent MP3 Program and eliminating access to Plaintiffs' purchased products, content, and services, effectively confiscating Plaintiffs' property without due process of law.

235. These unlawful actions were done with the specific intent to deprive Plaintiffs of their constitutional rights to secure their property.

236.   Plaintiffs are informed and believe that the acts of the Defendant, their employees, and agents, were intentional in failing to protect and preserve Plaintiffs' property, and, at minimum, Defendant was deliberately indifferent to the likely consequence that the property would be effectively and unlawfully seized, based on Defendant's past circumstances of similar constitutional and the cand statutory violations of the law.

237.   As a direct and proximate consequence of these unlawful acts, Plaintiffs have suffered and continue to suffer the loss of their personal property and are entitled to compensatory damages for their injuries.

**FIFTH CAUSE OF ACTION**
**BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING**

238.   Plaintiffs adopt by reference each and every paragraph of this Complaint as if fully copied and set forth at length herein.

239.   Plaintiffs entered into consumer transactions with Defendant for the purchase of products, content, and services, intended and represented to be wholly owned, accessible, and controlled by the purchaser, forever.

240.   Every consumer transaction imposes upon each party a duty of good faith and fair dealing in its performance and enforcement.

241.   The Plaintiffs have performed all of the conditions required of them under the transaction.

242.   Defendant knew or should have known that the products sold by Defendant in their MP3 Program were not wholly owned, accessible, and controlled by the purchaser, forever, and was of lesser quality, and more restrictive, ownership, access, and control.

243.   Defendant's conduct, as alleged above, constitutes a breach of its duty of good faith and fair dealing, in that, among other things, it fraudulently sold and induced Plaintiffs to purchase products, content, and services that would not be owned, access, or controlled, forever, instead of products, content, and services, that would be wholly owned, accessible, and controlled by the purchaser, forever.

244.   As a result of Defendant's conduct, Plaintiffs have been damaged, including as set forth above.

**SIXTH CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**

245.   Plaintiffs adopt by reference each and every paragraph of this Complaint as if fully copied and set forth at length herein.

246.   Defendant had a duty to provide honest and accurate information to its customers so that customers could make informed decisions on the substantial purchase of products, content, and services offered through Defendant's MP3 Program.

247.   Defendant specifically and expressly misrepresented material facts to Plaintiffs, as discussed above. Defendant was aware that the products represented to be wholly owned, accessible, and controlled by the purchaser, forever, were not, in fact, as such.

248.   Defendant knew, or in the exercise of reasonable diligence, should have known, that the ordinary and reasonable consumer would be misled by Defendant's misleading and deceptive representations.

249.   Defendant was aware that the posters, memos, and representations made regarding the MP3 Program's content, products, and services, representing them to be wholly owned, accessible, and controlled by the purchaser, forever, were not accurate.

250.   Plaintiffs justifiably relied on Defendant's misrepresentations and have been damaged thereby in an amount to be determined at trial.

## <u>SEVENTH CAUSE OF ACTION</u>
## UNJUST ENRICHMENT

251.   Plaintiffs adopt by reference each and every paragraph of this Complaint as if fully copied and set forth at length herein.

252.   Plaintiffs conferred a benefit on Defendant by purchasing Defendant's products, content, and services from Defendant's MP3 Program

253.   Defendant had knowledge that this benefit was conferred upon it.

254.   Because of its wrongful acts and omissions, Defendant charged a higher price for products, content, and services throughout the duration of the MP3 Program and Defendant obtained money which rightfully belongs to Plaintiffs.

255.   Defendant has been unjustly enriched at the expense of Plaintiffs and its retention of this benefit under the circumstances would be inequitable.

256.   Plaintiffs seek an order requiring Defendant to make restitution to them.

## EIGHTH CAUSE OF ACTION
## FRAUD/INTENTIONAL MISREPRESENTATION

257.   Plaintiffs adopt by reference each and every paragraph of this Complaint as if fully copied and set forth at length herein.

258.   During the Class Period, Defendant was engaged in the business of designing, manufacturing, marketing, distributing, or selling MP3 products, content, services through their MP3 Program, which is the subject of the present litigation.

259.   Defendant, acting through their officers, agents, servants, representatives, or employees, directly marketed and advertised MP3 Program products, content, and services to consumers and delivered those products, content, and services to consumers incarcerated in the MDOC through Defendant's network of kiosks and other distribution channels.

260.   Defendant willfully, falsely, and knowingly misrepresented material facts relating to the character, nature, and quality of the MP3 Programs and products,

content, and services contained therein. These misrepresentations were contained in the MP3 Program's advertising and other marketing materials disseminated or caused to be disseminated by Defendant, and such misrepresentations were reiterated and disseminated by officers, agents, representatives, servants, or employees of Defendant, acting within the line and scope of their authority, so employed by Defendant to merchandise and market the MP3 Program and the products, content, and services contained therein.

261. Defendant's representations were made with the intent that the MDOC prisoner population, including Plaintiffs, would rely upon them. Defendant's representations were made with knowledge of the falsity of such statements, or in reckless disregard of the truth thereof.

262. In actual and reasonable reliance upon Defendant's misrepresentations, Plaintiffs purchased products, content, and services from Defendant's MP3 Program for their intended and reasonably foreseeable purposes. Plaintiffs were unaware of the existence of facts that Defendant suppressed and failed to disclose. If they had been aware of the suppressed facts, Plaintiffs would not have purchased products, content, and services from Defendant's MP3 Program.

263. Plaintiffs are informed and believe, and thereon allege, that Defendant misrepresented material facts with the intent to defraud Plaintiffs. Plaintiffs were unaware of the intent of Defendant and relied upon the representations of

Defendant in deciding to purchase products, content, and services through Defendant's MP3 Program.

264. Plaintiffs' reliance on the representations of Defendant was reasonable.

265. In actual and reasonable reliance upon Defendant's misrepresentations, Plaintiffs purchased products, content, and services from Defendant's MP3 Program, the direct and proximate result of which was injury and harm to Plaintiffs because:

    a. They would not have purchased the products, content, and services from Defendant's MP3 Program on the same terms if the true facts concerning their character, nature, and quality had been known;

    b. They paid a price premium due to the mislabeling and misrepresentation of the character, quality, and nature of the products, content, and services from Defendant's MP3 Program; and

    c. The products, content, and services from Defendant's MP3 Program did not have the quality, functionality, or value as promised.

## NINTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY

266. Plaintiffs adopt by reference each and every paragraph of this Complaint as if fully copied and set forth at length herein.

267. At all relevant times, Defendant expressly warranted that the products, content, and services purchased by Plaintiffs throughout the duration of the MP3

Program would be wholly owned, accessible, and controlled by the purchaser, forever, as indicated throughout the duration of the MP3 Program by way of memos, posters, advertisements, and representations to consumers.

268.  Defendant, to induce the sales, made certain express warranties and representations to Plaintiffs, both orally and in writing (including, but not limited to, the MP3 Program statements contained in numerous bulletins and posters advertised to Plaintiffs, and which Defendant and their affiliates placed on display throughout MDOC facilities) and through their advertising and conduct.

269.  Defendant systematically misrepresented the products, content, and services sold in the MP3 Program. Defendant acted with full knowledge that the products, content, and services, were both defective, and additionally would no longer be accessible or useful to Plaintiffs after the termination of the program. By so acting, Defendant approved of and adopted the misrepresentations in the products, content, and services provided by the MP3 Program.

270.  Defendant knew and expected, or should have known and expected, and intended Plaintiff to rely on their warranties.

271.  The representations contained or constituted affirmations of fact or promises made by Defendant to Plaintiff related to the goods, and thus the affirmations of fact or promises became part of the basis of the bargain, creating an express warranty that the goods shall conform to the affirmations of fact or promises.

272.   In purchasing Defendant's MP3 Program products, Plaintiffs reasonably relied on the skill, judgment, representations, and foregoing express warranties of Defendant.

273.   These warranties and representations were false in that Defendant MP3 Program products would not actually be wholly owned, accessible, and controlled by the purchaser, forever.

274.   Because Defendant products did not conform to Defendant's express representation, Defendant breached the warranties.

275.   As a foreseeable, direct, and proximate result of the breach of express warranties by Defendant, Plaintiffs suffered injuries and damages as alleged herein.

## TENTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY

276.   Plaintiffs adopt by reference each and every paragraph of this Complaint as if fully copied and set forth at length herein.

277.   Defendant is a merchant with respect to the subject consumer products pursuant to MCL 440.2104.

278.   The products, content, and services Plaintiffs purchased through Defendant's MP3 Program were subject to implied warranties of merchantability under MCL 440.2314.

279. These implied warranties and representations, and the corresponding impressions they created included, but were not limited to, representations that the MP3 Program's products, content, and services afforded consumers' the present and continued availability of all products, content, and services purchased through the MP3 Program for use indefinitely.

280. Contrary said warranties and representations, contemporaneous to and following Plaintiffs' purchases, Defendant's terminated and discontinued the MP3 Program.

281. As a result, Plaintiffs cannot use the products, content, and services they purchased through Defendant's MP3 Program.

282. Defendant has been unable and/or have refused to correct this problem or to void the purchases within a reasonable time.

283. As a direct and proximate result of Defendant's breaches of warranty, Plaintiffs have suffered damages, including the costs of purchasing products, content, and services from Defendant's MP3 Program, diminished value of the products, content, and services purchased, interruption in use of the products, content, and services, and the cost of cover including having to purchase new products, content, and services to replace the products, content, and services taken by Defendant, together with costs and attorney fees incurred in attempting to obtain relief from Defendant's wrongful conduct.

# PRAYER

**WHEREFORE**, Plaintiff, individually and on behalf of the Class prays for judgment against Keefe, as follows, as appropriate to each cause of action alleged and as appropriate to the particular standing of Plaintiff and Class of similarly situated individuals:

a. Finding that this action satisfies the prerequisites for maintenance as a class action under Fed. R. Civ. 23(b)(2) and 23(b)(3), and applicable case law and certifying the Class and subclass defined herein;

b. Designating Plaintiff as representative of the Class and their counsel as Class counsel;

c. Pursuant to Plaintiff's causes of action, entering judgment awarding Plaintiff and all members of the Class restitution and/or other equitable relief, including, but not limited to, restitutionary disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiffs as a result of its unfair, unlawful, and fraudulent business practices described herein;

d. An order enjoining Defendant from continuing to violate the Michigan Consumer Protection Act, MCL § 450.901 *et seq.*

e. A judgment awarding Plaintiff and other members of the Class their costs

of suit; including reasonable attorney's fees pursuant to MCL § 445.911 and

as otherwise permitted by statute; and pre and post-judgment interest;

f. Such other and further relief as the Court deems appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial on all claims so triable in this action.

Dated:  January 16, 2017

Respectfully Submitted,

EXCOLO LAW, PLLC

By:   */s/ Keith Altman*

Keith Altman (P81702)
Solomon Radner (P73653)
Ari Kresch (P29593)
26700 Lahser Road, Suite 401
Southfield, MI 48033
Office: (866) 939-2656
Direct: (516) 456-5885
kaltman@excololaw.com

*Attorneys for Plaintiff and the Class*
